### In the United States District Court
### for the District of Kansas

_____

Case No. 23-cv-02395-TC

_____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Plaintiff*

v.

WALMART INC.,

*Defendant*

_____

### MEMORANDUM AND ORDER

The Equal Employment Opportunity Commission sued Walmart Inc., alleging Walmart discriminated against two deaf employees in violation of the Americans with Disabilities Act, as amended (ADAAA), 42 U.S.C. § 12101 *et seq*. Doc. 1. Walmart moved for summary judgment, Doc. 95, and to exclude the EEOC's expert witness, Doc. 93. And the EEOC moved for partial summary judgment on one of Walmart's affirmative defenses. Doc. 92. For the following reasons, Walmart's motion for summary judgment is granted in part and denied in part, and all other pending motions are denied.

## I

### A

Each type of motion, one seeking to exclude expert testimony and the others seeking summary judgment, has a different standard that governs its resolution. The following describes each applicable standard.

**1.** The admissibility of expert testimony is guided by Federal Rule of Evidence 702. *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). To fulfill its gatekeeping role, a trial court must ensure that the

expert is qualified and that his or her testimony is both reliable and relevant. *Id.* at 1180–81. "Rule 702 requires an expert witness to be qualified by 'knowledge, skill, experience, training, or education.'" *Tudor v. Southeastern Okla. State Univ.*, 13 F.4th 1019, 1029 (10th Cir. 2021) (quoting Fed R. Evid. 702). Testimony is reliable if "it is based on sufficient data, sound methods, and the facts of the case." *Roe*, 42 F.4th at 1181 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). It is relevant if it helps the trier of fact "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *Sanderson v. Wyoming Highway Patrol*, 976 F.3d 1164, 1172 (10th Cir. 2020).

**2.** Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency that Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

**B**

**1.** This lawsuit centers around two former Walmart employees who claim that Walmart failed to provide them with reasonable accommodations while they worked there. Doc. 1.[1] The two former employees are Marvin Montoya and Raymond Moore. *See* Doc. 96 at ¶ 2.a.iv.

Montoya and Moore are both deaf. Doc. 96 at ¶ 2.a.x. To communicate, they use American Sign Language and written English. *Id.* at ¶¶ 2.a.xiii–2.a.xiv; Doc. 103 at 13–14, ¶¶ 4–9. Moore also has limited lipreading abilities. Doc. 103 at 14, ¶ 8. Montoya and Moore read at a fourth-grade and eighth-grade level, respectively. *Id.* at 13–14, ¶¶ 4, 7. Montoya "struggles with English words which have multiple meanings" and "will read words which he thinks he understands, not realizing that he has missed the contextual clues which would have told him that an alternate definition was being used." *Id.* at 13, ¶ 4. Montoya and Moore both require a sign language interpreter to communicate when they need to "understand complex or critical information, such as healthcare, safety instructions, employment, or insurance benefits, or legal information." *Id.* at 14, ¶¶ 6, 9.

Walmart hired Montoya and Moore to be overnight stockers at its location in Olathe, Kansas. Doc. 96 at ¶ 2.a.ix. A sign language interpreter was present at Montoya's interview, Doc. 103-1 at 7, and Moore communicated through written questions and answers during his, Doc. 95-9 at 7. Both got the job: Montoya started working at Walmart in March 2019, and Moore started a few months later in July. Doc. 96 at ¶¶ 2.a.xi–2.a.xii. Montoya and Moore were dissatisfied at Walmart with the lack of accommodations and some managers' refusal to effectively communicate with them in writing. Doc. 103-20; Doc. 103-21. Moore resigned in March 2020, eight months after he started, and Montoya worked as an overnight stocker for over a year and a half, resigning in March 2021. Doc. 103 at 12–13, ¶¶ 48, 52. Each left because he felt he

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF. All facts are uncontroverted or, to the extent controverted, construed in the light most favorable to the EEOC as the party opposing Walmart's motion for summary judgment. *See E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1189 (10th Cir. 2000). It is not necessary to construe the facts in Walmart's favor because, as explained in further detail below, the EEOC's motion for partial summary judgment has been rendered moot.

was discriminated against during his time working at Walmart. *Id.* at 27, ¶¶ 119–20.

**2.** Before providing more detail about Montoya and Moore's employment at Walmart, a description of Walmart's policies governing accommodations for employees with disabilities may be helpful. First, Walmart's policies instruct managers on what they should do if they notice or learn that a disabled employee may need assistance due to his or her condition. Doc. 103 at 14, ¶ 11. The policy allows for some adjustments to be made at the facility level if the adjustment is "easily achievable and do[es] not have a negative impact on the business." Doc. 95-3 at 7. But if something more is required, then Walmart's policy instructs managers to direct the employee to Walmart's Accommodation Service Center to formally request an accommodation. Doc. 103 at 15, ¶ 12; Doc. 95-3 at 6. An employee may also trigger this process by informing a salaried manager or a human resources representative that the employee needs assistance to do his or her job. Doc. 95-3 at 22.

Second, Walmart's policy describes the process its Accommodation Service Center uses to determine whether to grant an employee's formal accommodation request. Doc. 95-3 at 17–20. The Accommodation Service Center first requests information from the employee by mailing him or her an accommodation packet that includes, among other things, a medical questionnaire. *Id.* at 17. It may need additional medical information "to help understand the nature of the associate's medical condition or disability, how it affects their job performance, and whether any accommodation would be reasonable and effective." *Id.* at 18. This information is not always necessary if the employee has a condition that "is known or otherwise obvious." *Id.* If additional information is necessary, however, Walmart will close the accommodation request if the employee fails to provide the requested information within twenty days. *Id.*

Once the Accommodation Service Center has the materials it needs, it will decide how to process and/or address the request. Doc. 95-3 at 18–20. Walmart's policy generally considers sign language interpretation a reasonable accommodation for deaf employees. Doc. 103 at 15, ¶ 14.

In light of Walmart's policy and federal employment discrimination law, the EEOC's position is that Walmart refused to reasonably accommodate Montoya and Moore, despite their requests. Doc. 96 at

¶ 4.a. There is evidence that Montoya informed multiple supervisors that he needed accommodations in the form of written communication or sign language interpretation during his overnight stocking shifts, orientation, team meetings, computer-based learning modules, and coaching sessions. Doc. 103 at 17–19, ¶¶ 31, 47. And so did Moore. *Id.* at 19, ¶¶ 50–51. In particular, the EEOC has produced evidence that Moore requested accommodations during his regular shifts, orientation, team meetings, and so he could complete his computer-based learning modules. *See id.* at 17–19, ¶¶ 37, 50, 51.

**3.** Understanding the EEOC's arguments requires a familiarity with Montoya and Moore's work environment during the overnight stocking shift at the Walmart store where they worked. Montoya and Moore's duties generally included "stocking and rotating merchandise, removing damaged or out-of-date goods, setting up, cleaning and organizing product displays, [and] signing and pricing merchandise." Doc. 103 at 3–4, ¶ 10. Stockers did not work in the same department each shift, and they would often work in multiple departments throughout a single shift. *Id.* at 7–8, ¶¶ 22–24. Throughout each shift, managers or team leads communicated with overnight stockers like Montoya and Moore. *See id.* at 3, ¶ 7. For example, Krystle Lucas, a team lead, testified that she would typically check in with overnight stockers at least once an hour "just seeing where they're at on their stocking times or making sure they didn't need anything." Doc. 95-13 at 3.

Montoya and Moore asked Walmart to accommodate them during their overnight shifts so they could communicate with their supervisors. Doc. 103 at 17, ¶¶ 31, 37. They both asked managers at Walmart to communicate with them in writing. *Id.* And each of them also requested that Walmart provide a sign language interpreter during their overnight shift. Doc. 103-1 at 7–8; Doc. 103-2 at 7–9.

Montoya and Moore used various methods to communicate with managers and team leads during their overnight stocking shifts. Doc. 103 at 3, ¶¶ 7–9. For example, they both communicated with supervisors by writing notes on a pen and paper, on cardboard with a permanent marker, or by using the notes application on their cell phones. *Id.* In addition, one of Walmart's overnight stocking managers, David Walter-Gates, would communicate with Montoya and Moore by spelling words with his fingers in sign language. *Id.* at 3, ¶ 9. But Walter-Gates was not an interpreter, nor was he fluent in American Sign Language. *Id.* at 18, ¶¶ 39, 40, 42.

The communication between Montoya and Moore and their supervisors was not always effective. Take the written communication first. Montoya testified in his deposition about the issues he faced when attempting to communicate with his supervisors during his overnight stocking shifts. *See* Doc. 103 at 3, ¶ 7 (citing Doc. 103-1). For example, he testified that one of his managers, Kenan Akers, refused to engage in written communication with him. Doc. 103-1 at 3. He said Akers would speak verbally to him, and Montoya would attempt to clarify by writing, "I need you to write, you know that I'm deaf, I can't hear you." *Id.* Instead of writing, Montoya stated that Akers would "look at it and go, yeah. And then kind of shoo me on my way to get back to work." *Id.*

Moore had similar experiences. Moore stated that he once asked his manager, Adam Gosling, a question about his job and stocking school supplies during a shift. Doc. 103-4 at ¶ 3. Gosling read the question, but instead of responding, he walked away without answering. *Id.* at ¶ 3. The communication barriers went both ways. At least one manager, Austin Duvall, testified that he struggled to effectively communicate in writing what he wanted to convey to Montoya, remarking that "[i]t would be difficult to explain exactly what I was trying to say on pen and paper." Doc. 103-8 at 24.

The fingerspelling assistance from Walter-Gates did not solve these communication problems. Moore and Montoya found it difficult to understand what Walter-Gates was attempting to communicate, Doc. 103 at 18, ¶ 43, and Walter-Gates often could not understand what Moore and Montoya were communicating in sign language to him, *id.* at 18, ¶ 41. When Walter-Gates did not understand, he would communicate in writing with Montoya and Moore. Doc. 107 at 3, ¶¶ 41, 43.

**4.** The EEOC's claims implicate other aspects of Montoya and Moore's employment like trainings and meetings, too. In particular, it focuses on team meetings that occurred at the beginning of overnight shifts, Doc. 103 at 19–21, computer-based learning modules, *id.* at 21–22, and training on how to operate powerlifting equipment, *id.* at 23–24.

One of the EEOC's contentions is that Walmart was required to provide an ASL interpreter during Montoya's and Moore's orientation sessions but failed to do so. Doc. 96 at 5. The orientation was a three-hour session that covered topics like health insurance, vacation time,

stock purchasing, and other benefits related to employment at Walmart. Doc. 103 at 16–17, ¶¶ 23, 29. It also included a "safety walk," which was a guided physical tour to orient new employees with the premises. *Id.* at 16, ¶ 22. Montoya and Moore each assert that they requested a sign language interpreter to translate their orientation sessions. *Id.* at 16, ¶¶ 24, 27. Walmart did not provide an interpreter at either session. *Id.* at 16–17, ¶¶ 25, 28. As a result, Montoya testified that he "did not understand what was discussed at orientation," *id.* at 16, ¶ 26, and Moore testified that he "just sat there . . . killing time for several hours" because he "did not know what was discussed," *id.* at 17, ¶ 29.

The EEOC also focuses on team meetings that would occur at the beginning of an overnight stocking shift and last for fifteen to twenty minutes. Doc. 103 at 19–21. At the team meetings, the supervisors on duty would communicate to overnight stockers who would work in each department and the timeframes in which they were expected to finish stocking merchandise. *Id.* at 4, ¶ 11. After the meeting, a printed assignment sheet would be posted in the office for overnight stockers to reference throughout the shift. *Id.* at 4, ¶ 12. The parties agree that the assignment sheets would include each stocker's department assignments, but there is a factual dispute regarding whether the printed document included the timeframes that stockers were given to complete their assignments. *Id.* at 4–5, ¶ 13.

The meetings addressed additional topics, too. Specifically, managers orally provided information about employee health insurance, discounts, and changes in store protocols related to COVID-19. Doc. 103 at 20–21, ¶ 63. And managers would update employees on certain safety-related concerns at the team meetings. *Id.* For example, when Walmart provided stockers with a new type of box cutter, managers used the team meeting to explain what it was, how to use it, and new policies surrounding it. Doc. 103-8 at 7.

Overnight stockers were expected to attend team meetings. Doc. 103 at 20, ¶ 56. Indeed, their job description includes "participating in team meeting to learn daily and weekly objectives" in the essential functions section. *Id.* at 21, ¶ 64 (citing Doc. 95-18 at 2). Multiple managers and team leads also testified that it was important for overnight stockers to attend, pay close attention, and understand what was happening during the meetings. *Id.* at 20, ¶¶ 56–58. Nonetheless, overnight stockers were not disciplined if they did not attend the meeting. Doc.

95-1 at ¶ 15. And Montoya and Moore did not always attend. Doc. 103 at 6, ¶ 19.

There are several factual disputes, which are viewed in the EEOC's favor, regarding how Montoya and Moore were informed of the content that they missed during their meetings. Walmart asserts that if a meeting covered a safety-related topic, managers would conduct a safety demonstration with Montoya and Moore. Doc. 95-1 at ¶ 17. In addition, it asserts that managers would communicate with Montoya and Moore after the team meetings to explain to them what a meeting covered and answer any questions they had. *Id.* at ¶¶ 18–20. But the EEOC presented evidence controverting Walmart's assertion. Doc. 103-1 at 6 (Montoya's testimony that managers barely wrote notes for him during the meetings, if they wrote anything at all); Doc. 103-2 at 9 (Moore's testimony that nobody explained to him what happened during the meetings).

As part of their initial onboarding and as an ongoing training process, overnight stockers also completed computer-based learning modules. Doc. 103 at 21, ¶ 68 (citing Doc. 103-8 at 11–12). The modules "could encompass complex topics, including safety." *Id.* at 21, ¶ 69. The module's videos had closed captioning, but sometimes it "'would freeze' or 'get stuck.'" *Id.* at 22, ¶ 75. Montoya and Moore each testified that he asked a member of Walmart's management if a sign language interpreter could help him complete the computer-based learning modules. *Id.* at 21, ¶¶ 73–74. Instead, members of Walmart management—Wayne Thornberg and Michelle Eddy—completed examinations required by the module on Montoya and Moore's behalf. *Id.* at 22, ¶¶ 75–76.

Moore and Montoya also requested training on how to operate powerlifting equipment. Doc. 95-1 at ¶ 39. Managers generally operated powerlifting equipment during the overnight shift, *id.* at ¶¶ 40, 43, and Montoya and Moore cannot remember any specific stockers who were trained and authorized to operate powerlifting equipment during the overnight shift, *id.* at ¶ 43. Moore and Montoya were given different explanations by different managers as to why they could not receive training on how to operate powerlifting equipment. *Id.* at ¶¶ 42, 47. One explanation that a member of management, Austin Duvall, gave Montoya was that his hearing created too much of a safety issue. Doc. 103 at 23, ¶ 87. Managers also told Montoya and Moore that Walmart did not train and did not need to train overnight stockers on powerlifting equipment, making it unnecessary to provide such

training to Montoya and Moore. Doc. 95-1 at ¶¶ 40–47. Montoya and Moore told one of their supervisors, Walter-Gates, that they felt Walmart's denial to train them on the powerlifting equipment was discriminatory. Doc. 103 at 22, ¶ 77 (citing Doc. 103-5 at 4).

**5.** In February 2020, Montoya and Moore each filed a charge of discrimination with the EEOC. Doc. 103 at 23, ¶ 84. Their charges were identical, each alleging he was discriminated against for three reasons. *Compare* Doc. 103-20 (Moore's Charge of Discrimination), *with* Doc. 103-21 (Montoya's Charge of Discrimination). First, Montoya and Moore alleged that managers at Walmart refused to accommodate their requests to communicate with them in writing so that they could understand the information superiors were sharing, including safety and other operational details. Doc. 103-20 at 1; Doc. 103-21 at 1. Second, they both alleged that they asked Walmart to provide them with an ASL interpreter at team meetings, but that Walmart refused to accommodate those requests. Doc. 103-20 at 1; Doc. 103-21 at 1. And third, they alleged that their managers refused to train them on power-lifting equipment because of their disabilities. Doc. 103-20 at 1; Doc. 103-21 at 1.

A few weeks later, Moore resigned from Walmart. Doc. 103 at ¶ 48. He received social security disability benefits for about a year, until he started a new job at Amazon as a fulfillment associate in March 2021. *Id.* at ¶ 49; Doc. 95-1 at ¶ 50.

Two days after Moore resigned, Montoya had a coaching session with two members of Walmart's management team, Kenan Akers and David Walter-Gates, to address his productivity. Doc. 103 at 8, ¶ 25. A job performance coaching is a form of discipline at Walmart designed to help employees improve in an identified area. *See id.* at 8, ¶¶ 25–29. Walter-Gates—who could not utilize ASL—attempted to interpret for Montoya during the coaching, but Montoya did not understand what Walter-Gates was attempting to communicate. *Id.* at 25, ¶ 103. In fact, Montoya "did not understand that he was being issued a job performance coaching" during the meeting. *Id.* at 25, ¶ 102.

One of Montoya's team leads, Krystle Lucas, thought Montoya needed a sign language interpreter for future coaching purposes. Doc. 103 at 25, ¶ 104. Lucas did not believe that written communication would sufficiently accommodate Montoya in a coaching. *Id.* As a result, a formal accommodation request was submitted on Montoya's behalf through Walmart's Accommodation Service Center. *Id.* at 25, ¶ 105. It

is unclear who submitted that request, but the paperwork suggests that one of Montoya's supervisors, Michelle Eddy, may have submitted it. *Id.* at 25, ¶ 107. Subsequently, Montoya received a letter requesting additional medical documentation to support his accommodation request. *Id.* at 25–26, ¶ 108. Montoya did not understand what the letter was requesting, so he did not respond. *Id.* at 26, ¶ 109. As a result, Montoya's accommodation request was administratively closed pursuant to Walmart's policy. *Id.* at 26, ¶ 110.

Montoya received a second coaching in September 2021. Doc. 103 at 26, ¶ 111. The supervisors that issued Montoya's second coaching were Krystle Lucas and Chanoa Richard. *Id.* at 26, ¶ 111–112. Walmart asserts that the managers communicated with Montoya through a video-relay service that provided ASL interpretation on a cell phone. Doc. 95-1 at 11, ¶ 35. But that assertion is contested: Montoya disputes that any sign language interpretation—virtual or in person—occurred during the second coaching session. Doc. 103 at 16, ¶ 114. At this stage of the proceedings, the EEOC's properly supported assertion is taken as true.

About a month later, Amazon offered Montoya a job as a warehouse associate. Doc. 107 at 9, ¶ 119. Montoya resigned from his position at Walmart the day after he received the offer, Doc. 95-1 at 13, ¶ 52, and he started at Amazon in October 2021, *id.* at ¶ 51.

The EEOC concluded its investigation of the charges of discrimination that Moore and Montoya filed in 2020, one month before Moore resigned and over one year before Montoya resigned. Doc. 103 at ¶¶ 121–122. The EEOC determined that Walmart violated the ADAAA by failing to accommodate Montoya and Moore and by constructively discharging them. Doc. 103-24; Doc. 103-25. Unable to reach an informal resolution, the EEOC filed this lawsuit against Walmart. Doc. 1; 42 U.S.C. § 12117(a) (authorizing the EEOC to bring actions to enforce Title I of the ADA).

## C

The EEOC alleges four claims against Walmart. Doc. 96 at 10. In Counts I and II, it asserts that Walmart failed to reasonably accommodate Moore and Montoya's disabilities in violation of the ADAAA. Doc. 96 at ¶ 4.a.i–4.a.ii. And in Counts III and IV, it asserts that Walmart constructively discharged Montoya and Moore because they are deaf. *Id.* at ¶ 4.a.iii–4.a.iv. The EEOC seeks emotional-distress

damages and punitive damages on all four counts, and it seeks backpay for Montoya and Moore to compensate them for the time they were unemployed after Walmart allegedly constructively discharged them. *Id.* at 13.

Walmart moved for summary judgment on all four counts. Doc. 95. It denies the EEOC's claims that Walmart failed to reasonably accommodate Moore and Montoya, asserting that managers communicated with Moore and Montoya effectively in writing. Doc. 95-1 at 16–21. In addition, Walmart argues that Montoya and Moore cannot succeed on their constructive discharge claims because they voluntarily resigned from Walmart due to personal dissatisfaction and/or more lucrative employment. *Id.* at 21–25. Walmart also seeks summary judgment on the EEOC's requests for punitive damages. *Id.* at 26–27.

Two other motions are at issue. First, the EEOC moved for partial summary judgment, seeking judgment on one of Walmart's affirmative defenses. Doc. 92. Walmart's defense is that Montoya and Moore failed to mitigate the damages that they could have recovered as backpay if they prevailed. *See* Doc. 101 at 4–7. The EEOC asserts that it is entitled to summary judgment on that defense because Walmart produced no evidence that there were suitable positions that Montoya and Moore could have discovered and for which they were qualified after they resigned from Walmart. Doc. 92 at 2–4. Second, Walmart seeks to exclude the EEOC's expert, Roger C. Williams, who the EEOC asked to opine about deafness, communication between deaf and hearing individuals, and how sign language interpretation may assist deaf individuals communicate at work. Doc. 93.

## II

Walmart's motion for summary judgment is granted in part and denied in part. Because the EEOC has not identified evidence to support its ADAAA claim based on constructive discharge, Walmart is granted judgment as to that claim. But it is denied judgment as to the EEOC's failure-to-accommodate claims, its request for punitive damages, and its motion to exclude the EEOC's expert testimony.

## A

The EEOC plans to present expert testimony from Roger C. Williams. Doc. 102-1. Williams specializes "in consulting and training related to the needs of deaf adults in the mental health system." *Id.* at 33.

11

He has worked in various roles related to interpretation, treatment, and access for deaf individuals. *Id.* at 6. In one of his prior roles, he advised a state department "on matters related to the recruitment, hiring, and retention of individuals with a hearing loss." *Id.*

Williams's testimony can be summarized as four opinions. Doc. 102-1 at 19–20. He first opines that Walmart did not provide effective accommodation to Montoya and Moore that would allow them to "enjoy all the benefits and privileges of their employment" or to "receive the same access to information provided to hearing co-workers." *Id.* His second opinion is that Walmart failed to follow its own policies requiring it to provide reasonable accommodations to deaf employees. *Id.* at 20. Third, he opines that Walmart failed to provide an effective interpreter for Montoya and Moore, instead providing an unqualified interpreter—Walter-Gates—to translate between Walmart managers and Montoya and Moore. *Id.* And his final opinion is that Walmart's procedure for requesting an accommodation and its forms that employees are required to complete are "inherently inaccessible for individuals who are deaf and do not have the written English competence to understand the forms." *Id.*

Walmart moves to exclude Williams's testimony. Doc. 93. First, it argues that Williams's opinions are unreliable and irrelevant because they misstate the record and make generalizations based on a small sample of experience. Doc. 94 at 5–11. Second, it asserts that Williams's opinions invade the province of the jury by applying the law to the facts and telling the jury what to decide. *Id.* at 11–14. Third, it says that Williams's opinions will unfairly prejudice Walmart in a way that substantially outweighs the probative value of those opinions. *Id.* at 14–15.

The EEOC, as the proponent of Williams's testimony, bears the burden of establishing its admissibility by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). It has done so here. As a result, Walmart's motion to exclude is denied.

**1**

Walmart argues that Williams's opinions are unreliable and irrelevant. Doc. 94 at 5. Testimony is reliable if it is based on sufficient facts and data, is the product of reliable principles and methods, and is the result of the expert reliably applying the principles and methods to the facts of the case. *See Roe v. FCA US LLC*, 42 F.4th 1175, 1180–81

(10th Cir. 2022) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)); *see also* Fed. R. Evid. 702(b)–(d). And testimony is relevant if it "will help the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1136 (10th Cir. 2014). Walmart challenges three discrete conclusions that Williams made. Doc. 94 at 5–11.

**a.** Walmart first challenges Williams's opinion that David Walter-Gates was not a qualified sign language interpreter. Doc. 94 at 6–7. Its only argument in support is that Williams misstated the record, meaning Williams relied on unreliable facts and data to arrive at his conclusions. *See id.*

Williams's challenged opinion relies, in part, on Walter-Gates's own statement that "he was not qualified to interpret." Doc. 94 at 7; Doc. 102-1 at 18. Walmart asserts that Walter-Gates was referring to statements he made because Montoya and Moore were attempting to use him as an interpreter—rather than Walmart attempting to use Walter-Gates as an interpreter to accommodate Montoya and Moore. Doc. 94 at 7. According to Walmart, it is misleading for Wiliams to use that statement in support of his opinion that Walmart improperly used Walter-Gates as an unqualified interpreter for Moore and Montoya. *Id.*

For one thing, the record does not support Walmart's assertion. Walter-Gates stated that "he made it clear to everyone that he was not an ASL interpreter and that he knew very little sign language," that "he would get called over when there were conversations with [Montoya and Moore]," and that "he would always tell them right away that he was not an interpreter." Doc. 94-2 at 2. In any event, the concerns Walmart raised speak to the weight of Williams's opinion and are more properly addressed on cross examination than through exclusion. *See Goebel v. Denver & Rio Grande W. R. Co.*, 346 F.3d 987, 999 (10th Cir. 2003).

**b.** Walmart makes a similar reliability challenge to Williams's statement that Montoya and Moore's supervisor, Austin Duvall, refused to train Montoya and Moore on powerlifting equipment because they were deaf. Doc. 94 at 7–8; Doc. 102-1 at 18. Walmart argues that the facts and data on which Williams's conclusion is based—i.e., Duvall's deposition testimony—are inaccurate. Doc. 94 at 7–8. But Williams relied on the EEOC's evidence that Duvall told Montoya that he could not train him on powerlifting equipment because his hearing limitations would create a safety issue for himself and others. *Id.* Walmart's

argument appears to rely on the fact that Williams's statement about Duvall is based on a contested fact. *Id.* at 8. Walmart has not pointed to any authority suggesting that an expert may only rely on uncontested facts to support his or her conclusions. Rather, experts regularly rely on deposition testimony to form their opinions. *See, e.g., Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243 (10th Cir. 2000) (finding no abuse of discretion where an expert's testimony based on a review of depositions and discovery material was admitted); Fed. R. Evid. 703 (permitting experts to rely on evidence so long as an expert "in the particular filed would rely on those kinds of facts or data").

It may be different if Williams's entire opinion were that Duvall refused powerlifting equipment training for Montoya and Moore because they were deaf. *Cf. Rowe v. DPI Specialty Foods, Inc.*, 727 F. App'x 488, 501 (10th Cir. 2018) (affirming exclusion of unreliable testimony that simply asserted contested facts as true). Instead, it is one fact among fourteen pages of facts and data that Williams considered in forming his opinions about the effectiveness of Walmart's accommodations. *See* Doc. 102-1 at 7–20; *Rowe*, 727 F. App'x at 500 n.11 ("However, *making* assumptions based on facts in evidence, and *asserting* assumptions as uncontroverted facts or as expert opinions to the jury, are two different things."). Walmart may attempt to disprove the allegation that Williams relies on or make a contemporaneous objection if the helpfulness of Williams's opinions regarding powerlifting equipment lessens after Walmart's summary judgment motion is resolved. But Walmart's concerns do not support a pretrial ruling excluding William's opinion. *See Goebel*, 346 F.3d at 999.

**c.** Walmart's next challenge regards Williams's opinions concerning Walmart's reasonable accommodation policy. Doc. 94 at 8. It frames its argument as one challenging the reliability of Williams's opinions, but it first asserts that Williams is unqualified to testify about Walmart's compliance with its reasonable accommodation policies. *Id.* Then it argues that Williams's opinion that Walmart's policy is inaccessible for deaf individuals is based on an unreliable generalization. *Id.* at 8–9. Finally, it argues that Williams's opinion is irrelevant because it goes beyond the scope of the lawsuit. *Id.* at 10–11.

Williams is qualified to opine about whether Walmart's actions complied with its reasonable accommodation policy. To qualify as an expert, a witness must "possess skill, experience, or knowledge in the 'particular field'" or the field must "fall 'within the reasonable confines' of [the witness's] expertise." *Conroy v. Vilsack*, 707 F.3d 1163, 1169

(10th Cir. 2013) (citations omitted). Walmart contends that Williams's opinions about Walmart's policies are based only on his general experience as a supervisor. Doc. 94 at 8. But Williams's qualifications are more specific than that. When he worked at a state department of mental health, he was not just a supervisor: He "was responsible for hiring and supervising multiple deaf employees, as well as advising the Department's Human Resources division on matters related to the recruitment, hiring, and retention of individuals with a hearing loss." Doc. 102-1 at 6. As a result, Williams is "stay[ing] within the reasonable confines of his subject area" and not providing "opinions on an entirely different field or discipline." *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991); *cf. Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (finding general expertise as a surgeon insufficient to testify about the adequacy of a warning regarding a specific medical technique).

In addition, Williams's opinion that Walmart's reasonable accommodation policies are inaccessible is based on reliable data. *Contra* Doc. 94 at 8–9. Walmart contends that Williams's opinion "is based upon merely one single interview with Montoya." *Id.* at 9. That argument fails for several reasons. One is that there is no requirement that an expert must discount or ignore evidence if it is not supported by multiple witnesses. *Tudor v. Southeastern Okla. State Univ.*, 13 F.4th 1019, 1031 (10th Cir. 2021) (noting that concerns regarding the sample size an expert relied on or evidence that an expert did not consider when forming an opinion are appropriate topics for cross-examination rather than exclusion). Another, more important point is that it again misstates Williams's report. Williams relies on data about developmental language delays and reading levels in deaf adults, his experience working with human resources specialists, and interviews with both Montoya and Moore. Doc. 102-1 at 7–20. That Williams has not provided more experience or data to support his conclusion goes to the weight rather than the admissibility of his testimony that can be explored at trial. *Ingersoll-Rand Co.*, 214 F.3d at 1244 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)).

Finally, Williams's opinions about Walmart's accommodation policies are relevant. Walmart disagrees, asserting that they exceed the scope of the lawsuit and will not help the jury decide any facts at issue. Doc. 94 at 11. Williams's opinion will help the jury understand how a deaf individual, like Montoya, may have misunderstood the requirements of Walmart's policies and how a sign language interpreter may

have been able to help deaf employees understand what they needed to do to ensure that they were reasonably accommodated at work. *See United States v. Cushing*, 10 F.4th 1055, 1079–80 (10th Cir. 2021) (explaining that expert testimony about knowledge derived from past professional experience may help jurors understand topics with which they are unfamiliar). And because jurors may lack knowledge about specific challenges facing deaf individuals, this testimony has the potential to help the jury determine whether Walmart failed to accommodate Montoya and Moore through its policies and actions. *See United States v. Zepeda-Lopez*, 478 F.3d 1213, 1222 (10th Cir. 2007) (explaining that exclusion is appropriate where the jury is "in as good a position" as the expert to make a conclusion). If any of Williams's opinions become irrelevant in light of the summary judgment ruling, Walmart may make a contemporaneous objection at trial.

### 2

Walmart then challenges five of Williams's opinions as impermissible legal conclusions. Doc. 94 at 12. Those opinions are that Walmart "failed to provide effective communication," "prevented Mr. Moore and Mr. Montoya from having access to the range of employment-related knowledge," "did not provide effective accommodation which would have allowed Mr. Moore and Mr. Montoya to enjoy all the benefits and privileges of their employment," "did not provide an effective interpreter," and that "Walmart's procedure for filing and documenting a disability and requesting accommodation is inherently inaccessible for individuals who are deaf." *Id.* at 12–13.

It is true that experts may not simply offer legal conclusions by applying the law to the facts. *See Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 771 (10th Cir. 2019). But Williams's opinions are not that. The legal conclusions that the jury must decide are whether Walmart failed to accommodate Montoya and Moore's disabilities and whether Montoya and Moore were constructively discharged. Doc. 96 at 10. Williams's opinions are premised on his explanation of deafness, communication, and Montoya and Moore's specific abilities and limitations. Doc. 102-1 at 7–20. *Cf. United States v. Richter*, 796 F.3d 1173, 1196 (10th Cir. 2015) (excluding a bare legal conclusion because it was not accompanied by a useful explanation). Walmart relies on a case in which Williams's opinions were excluded because he "purport[ed] to instruct the fact finder on the requirements of three federal laws." *See Mullen v. Claps*, No. 21-2398, 2024 WL 989399, at *5 (D. Colo. Mar. 7, 2024). But the opinions Williams proffers in this case are different.

While some of the language in Williams's opinion mirrors the legal standard, he does not attempt to opine on what the law requires or whether Walmart complied with specific federal statutes. *See United States v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008) (explaining that an expert may "refer to the law in expressing his or her opinion" even though experts may not "state legal conclusions drawn by applying the law to the facts"). If his testimony at trial strays into the governing law, a contemporaneous objection can address this concern.

### 3

Walmart's final argument to exclude Williams's testimony is that his opinion is more prejudicial than probative. Doc. 94 at 14; Fed. R. Evid. 403. Walmart relies on the same arguments it made above. It asserts that Williams encroaches on the jury's role, provides unhelpful opinions, and that his opinions are unreliable. Doc. 94 at 15. Those arguments have already been rejected, *infra* Section II.A.1–II.A.2, so Walmart has not shown that the extraordinary remedy of excluding evidence based on the danger of unfair prejudice is warranted. *See United States v. Silva*, 889 F.3d 704, 712 (10th Cir. 2018) ("The district court has considerable discretion in performing the Rule 403 balancing test, but exclusion of evidence under Rule 403 . . . is an extraordinary remedy and should be used sparingly.") (internal quotation marks and citation omitted).

### B

The EEOC contends that Walmart violated Montoya and Moore's rights by failing to accommodate their deafness. Doc. 96 at 10; 42 U.S.C. § 12112(a). Specifically, the EEOC's position is that Walmart refused to reasonably accommodate Montoya and Moore by providing them with a qualified sign language interpreter while they worked at Walmart and that the accommodations Walmart did provide were ineffective. Doc. 96 at 5.

### 1

The ADAAA provides that employers must not "discriminate against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under that section, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Id.*

§ 12112(b)(5)(A); *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018).

Failure-to-accommodate claims follow a burden-shifting framework at the summary judgment stage. *Lincoln*, 900 F.3d at 1204. The plaintiff must first show a prima facie case of disability discrimination, which requires the plaintiff to show that he or she is disabled, otherwise qualified for the position, that he or she requested a plausibly reasonable accommodation, and that the employer refused to provide it. *Id.* The burden then shifts to the employer to present evidence that conclusively rebuts the plaintiff's prima facie case or that establishes an affirmative defense. *Id.* A failure-to-accommodate claim does not require any showing of discriminatory intent, *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017), or adverse employment action, *Exby-Stolley v. Board of Cnty. Comm'rs*, 979 F.3d 784, 792 (10th Cir. 2020).

Walmart makes two arguments at this stage. The first implicates the reasonableness of Montoya and Moore's requests for accommodations. Doc. 95-1 at 16–18. Specifically, Walmart argues that the lack of accommodations Montoya and Moore claim relate to non-essential functions of their employment. *Id.* at 16, 19–21. And Walmart's second argument is that even if it had an obligation to provide accommodations in all the situations Montoya and Moore allege, it adequately provided accommodations. *Id.* at 16–18.

### 2

Walmart first argues that Montoya and Moore could fulfill the essential functions of their job without a sign language interpreter. Doc. 95-1 at 15. That requires determining whether the job functions for which Montoya and Moore requested accommodations were essential to the overnight stocker position.

An employer's obligation to accommodate disabled employees "is not absolute." *Unrein v. PHC-Fort Morgan, Inc.*, 993 F.3d 873, 878 (10th Cir. 2021). That is partly because employers need only provide *reasonable* accommodations to disabled employees who request them. *Id.* (emphasis added). Reasonable accommodations are those "which presently, or in the near future, enable the employee to perform the essential functions of his job." *Lincoln*, 900 F.3d at 1204–05. Determining whether a job function is essential is a fact-specific inquiry that asks whether the employer "actually requires all employees in the particular position to satisfy" the function. *Davidson v. America Online, Inc.*, 337

F.3d 1179, 1191 (10th Cir. 2003). An employer's judgment as to what functions of a position are essential is given significant deference. *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 888 (10th Cir. 2015); *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004) ("In short, the essential function inquiry is not intended to second guess the employer or to require the employer to lower company standards."). The EEOC's failure-to-accommodate claim implicates five functions of Montoya and Moore's position: communicating with managers throughout shifts; participating in team meetings concerning work objectives and safety concerns or instructions; attending the initial orientation session for new employees; completing computer-based learning modules; and receiving coaching from supervisors when necessary. Doc. 103 at 28–32.

Acknowledging that most functions are essential, Walmart only asserts that one of the identified functions for which Montoya and Moore requested an accommodation—participating in team meetings—is essential to the overnight stocker position. Doc. 95-1 at 17–18. Viewed in the light most favorable to the EEOC, this is an essential job function for an overnight stocker at the store where Montoya and Moore worked. For one thing, the job description expressly listed "participating in team meetings to learn daily and weekly objectives" as an essential function. Doc. 95-18 at 2; *Hawkins*, 778 F.3d at 885 (explaining that a job description is evidence of an employer's judgment regarding which job functions are essential). And multiple supervisors testified that overnight stockers were expected to attend team meetings, pay close attention, and understand what was happening at the meetings. Doc. 103 at 20, ¶¶ 56–58; *see Hennagir v. Utah Dep't of Corrs.*, 587 F.3d 1255, 1262–63 (10th Cir. 2009) (using testimony from decisionmakers at the agency regarding the importance of a job function to determine that the function was essential). True, Walmart has produced evidence that overnight stockers did not face discipline if they failed to attend team meetings. Doc. 95-1 at ¶ 15; *see Davidson*, 337 F.3d at 1191–92 (explaining that job functions may be non-essential if they are not uniformly enforced or if an employee may succeed without fulfilling them). But that is insufficient to conclusively rebut Walmart's evidence. Leaving aside the obvious safety and advancement concerns Moore and Montoya faced by not being able to meaningfully participate in such meetings, a reasonable jury could conclude that Walmart considered participating in team meetings an essential function of the overnight stocker position. *See Davidson*, 337 F.3d at 1191 (finding a genuine issue of material fact on whether a job duty was essential

where the employer's policy required employees to possess certain experience but there was evidence that the policy was not always enforced).

As noted, Walmart did not attempt to rebut the EEOC's assertions that the other four functions identified above are essential to the overnight stocker position. As a result, those functions will be considered essential in the subsequent analysis exploring whether Walmart reasonably accommodated Montoya and Moore in the essential functions of the overnight stocker position.[2]

**3**

Walmart also contends that the accommodations it *did* provide adequately allowed Montoya and Moore to fulfill the essential functions of the overnight stocker position. Doc. 96 at 10. In particular, Walmart points to the organic adaptations employed by Montoya, Moore, and their work colleagues, including the written communication that Montoya and Moore had with their supervisors and the written summaries or documentation that Montoya and Moore could access after team meetings regarding the topics that were covered. Doc. 95-1 at 17–18.

First, take the written communication between Montoya and Moore and their supervisors. Walmart emphasizes that Montoya and Moore effectively communicated with their supervisors during their overnight shifts by writing on notepads, cardboard boxes, or through electronic methods. Doc. 95-1 at 17. But the EEOC has produced evidence suggesting that this communication was insufficient and/or ineffective. Some managers refused to communicate in writing with Montoya and Moore, some said it was hard to convey what they wanted to say in writing, and others assumed that Montoya and Moore could read lips or that David Walter-Gates, one of Walmart's

---

[2] Instead of rebutting the functions that the EEOC identified, Walmart argued that operating powerlifting equipment is not an essential job function for overnight stockers. Doc. 107 at 10–11. But the EEOC's arguments regarding powerlifting equipment training are relevant only to their constructive discharge claim; the EEOC does not argue that Walmart's refusal to train Montoya and Moore on powerlifting equipment was a failure to accommodate. *See* Doc. 103 at 38. Consequently, it is unnecessary to determine whether operating powerlifting equipment was an essential function of Montoya and Moore's positions. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (explaining that issues concerning elements of the claim or defenses that are not in dispute are immaterial).

managers, was able to communicate with Montoya and Moore using sign language. Doc. 103 at 3, 8, 19, ¶¶ 7–9, 25, 48; *Aubrey v. Koppes*, 975 F.3d 995, 1008, 1009 (10th Cir. 2020) (finding a factual issue where the employer assumed what limitations the employee had when determining what accommodations could enable the employee to perform the essential functions of her job rather than identifying the limitations and exploring potential accommodations). A reasonable jury could find that Walmart's efforts to allow Montoya and Moore to communicate in such a rudimentary fashion by changing writings on an ad hoc basis with their managers failed to accommodate their disabilities. *See id.* at 1014 (holding that summary judgment for the employer was inappropriate on a failure-to-accommodate claim because there remained genuine evidence supporting the plaintiff's case).

Next, Walmart points to its attempts to inform Montoya and Moore what managers communicated during team meetings. Doc. 95-1 at 18. Walmart asserts that managers would provide written summaries of team meetings to Montoya and Moore, give Montoya and Moore an opportunity to ask questions after team meetings, and conduct safety demonstrations with Montoya and Moore if a safety topic was discussed during a team meeting. *Id.* at 18–19. But the EEOC's evidence creates a genuine dispute over this material fact. The EEOC has produced evidence that managers took little to no notes during team meetings when they attempted to provide written summaries to Montoya and Moore. Doc. 103 at 5–6, ¶ 18. The EEOC has also produced evidence that the meetings covered the timelines in which overnight stockers were expected to finish their assignments, but that the written documents available to Montoya and Moore did not include that information. *Id.* at 4–5, ¶ 13. And Montoya and Moore testified they did not understand what was happening at the meetings, that they never had the opportunity to ask questions about the meetings, and that they never participated in a post-meeting safety demonstration. *Id.* at 5–6, ¶ 18. In short, a jury must determine whether Walmart's efforts were effective—or not—for Montoya and Moore. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 400–01 (2002) ("An ineffective 'modification' or 'adjustment' will not accommodate a disabled individual's limitations."); *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1272 (10th Cir. 2015) (noting that a reasonable accommodation "must actually enable the employee to perform the essential function at issue").

Further, the EEOC claimed that Walmart failed to accommodate Montoya and Moore in additional settings that Walmart's summary

21

judgment papers did not address. Doc. 103 at 28–31. For example, the EEOC produced evidence that the closed captioning did not always work on the computer-based learning modules that Montoya and Moore were required to complete. *Id.* at 22, ¶ 75. As a result, Montoya and Moore did not understand the information presented in the modules, requiring their supervisors to complete the modules on their behalf. *Id.* at 22, ¶¶ 75–76. Walmart cannot prevail on summary judgment because it has not produced any evidence that would rebut the EEOC's position that Walmart failed to accommodate Montoya and Moore when they completed training through computer-based learning modules without effective accommodations. *Osborne*, 798 F.3d at 1273 (finding a fact question for the jury where the employee needed an accommodation to perform the essential functions of her job and the employer did not show that the proposed accommodation was not feasible or would be an undue hardship).

So, too, with Walmart's orientation session that new employees complete. Montoya and Moore did not understand or learn any of the information provided at the orientation session, including topics related to their safety. Doc. 103 at 16–17, ¶¶ 26, 29, 30; *Osborne*, 798 F.3d at 1274 (finding that an accommodation that would end up requiring additional accommodations to allow the employee to perform the full range of essential functions of her position was unreasonable).

### 4

Despite these factual disputes, Walmart makes two additional arguments in support of its summary judgment motion on the EEOC's failure-to-accommodate claim. Neither has merit.

First, Walmart argues that the EEOC's failure-to-accommodate claims must fail because Montoya and Moore admitted that they could perform the essential functions of their job. Doc. 95-1 at 18. For example, in Montoya's deposition, he was asked, "During your entire employment at Walmart, was there any part of your job that you weren't able to do?" Doc. 95-8 at 13. Montoya responded, "No." Doc. *Id.* Moore testified similarly. He was asked, "Did you have any issues performing your job duties as a stocker?" Doc. 95-9 at 14. Moore also said no. *Id.*

These generalized statements are insufficient to conclude that Walmart effectively accommodated Montoya and Moore's deafness for each of the essential functions of their jobs. That is because there

is nothing to suggest that Montoya and Moore, when they made those statements, were equating "job duties" or "any part of your job" to carry the same meaning as the legally significant term "essential job functions." A jury will be able to resolve whether Walmart's understanding of their selected testimony is consistent with an admission that they needed no accommodation due to their deafness or whether they felt they did an adequate job in light of the circumstances they were presented. *See E.E.O.C. v. Heartway Corp.*, 466 F.3d 1156, 1170 (10th Cir. 2006) (explaining that whether language in a witness's testimony referred to the language's legal meaning or one of its colloquial meanings was a question of fact properly left to the jury).

Second, Walmart asserts that the EEOC cannot prevail on its failure-to-accommodate claims because Walmart was not obligated to provide Montoya and Moore with their preferred accommodations—just reasonable ones. Doc. 95-1 at 16–19. This argument also falls short. If Walmart believed Moore and Montoya's requests for sign language interpretation were unreasonable then Walmart was required to engage in a "reasonably interactive manner" to address their requests. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171–72 (10th Cir. 1999); *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010). So, even if Walmart did not view their requests as reasonable or likely to give Moore and Montoya an equal opportunity, then it had the obligation under the ADAAA to meaningfully engage with them in good faith to attempt to find an accommodation that would be workable for both parties. *See Wilkerson*, 606 F.3d at 1266. There is no indication that this occurred.

Walmart's contrary authority fails to aid its cause. The employer in both *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136-37 (8th Cir. 1999), and *Schultz v. Alticor/Amway Corp.*, 177 F. Supp. 2d 674, 678–79 (W.D. Mich. 2001), successfully obtained summary judgment by establishing that the accommodation provided, although not the one preferred by the plaintiffs, was effective to allow the employee to perform the essential functions of the position. *Kiel*, 169 F.3d at 1136–37 (recognizing employees have the choice to choose among effective accommodations); *Schultz*, 177 F. Supp. 2d at 678–79 (holding that an employer did not need to fulfill an employee's specific accommodation request when other accommodations were effective). These cases are inapposite because the EEOC has shown a factual dispute as to whether the accommodations Walmart provided were provided at all and, if so, effective.

The third case Walmart relies on fails too. In *Edwards v. Wal-Mart Stores, Inc.*, 88 F. Supp. 2d 613, 618 (W.D. La. 2000), the employer obtained summary judgment in a case where the hearing-impaired employee brought an ADAAA claim because a certified sign language interpreter was not present where the record established that the employee did not require accommodations, did not request an accommodation, and had "never communicated through a certified interpreter while working at Wal-Mart, or at any other job or in his personal life during the relevant four-year time period." *Edwards*, 88 F. Supp. 2d at 618. That case stands in stark contrast to the situation here. The EEOC has presented evidence—some controverted and some not—that Moore and Montoya requested sign language interpretation as an accommodation and none was provided. Doc. 103 at 19, ¶¶ 47, 51. As a result, the evidence suggests they either failed to attend work meetings, zoned out during events where they could not understand the material being shared, or engaged in futile attempts to communicate via alternative means. That is sufficient to permit a jury to decide whether Walmart failed to accommodate Montoya and Moore.

## C

The EEOC also contends that Walmart discriminated against Montoya and Moore because they are deaf, resulting in Montoya and Moore's constructive discharge. Doc. 96 at 10; 42 U.S.C. § 12101. The EEOC's prima facie case requires it to show that Montoya and Moore were disabled, otherwise qualified for the overnight stocker position, and that Walmart constructively discharged them based on their disability. *Edmonds-Radford v. Southwest Airlines Co.*, 17 F.4th 975, 989 (10th Cir. 2021). The third element—whether discrimination occurred by way of constructive discharge—requires the EEOC to show that Montoya and Moore experienced an adverse employment action because they were deaf. *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037–38 (10th Cir. 2011). The EEOC's claims fail.[3] A constructive discharge

---

[3] Concluding that the EEOC's constructive discharge claims fail renders moot the EEOC's motion for partial summary judgment on Walmart's failure-to-mitigate defense, which is only applicable to the constructive discharge claim. Doc. 92; Doc. 101 at 4-7, and Walmart's argument that Montoya and Moore failed to exhaust their administrative remedies by not including constructive discharge in their charges of discrimination, Doc. 95-1 at 25–26. *See Sharp v. CGG Land (U.S.) Inc.*, 840 F.3d 1211, 1214 n.1 (10th Cir. 2016) (refraining from addressing arguments mooted by the grant of summary judgment).

occurs when an employee's working conditions are so intolerable that a "reasonable person in his position would have felt compelled to resign." *Rivero v. Board of Regents of Univ. of N.M.*, 950 F.3d 754, 761 (10th Cir. 2020). Proving intolerable working conditions is a substantial burden because proof of actionable discrimination or harassment is not itself enough. *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1235 (10th Cir. 2022).

Montoya and Moore fail to provide evidence that they faced the type of intolerable work conditions that a constructive discharge claim contemplates. Moore faced no discipline during his time at Walmart and has shown no evidence suggesting that his job required him to endure intolerable conditions or that his continued employment was at risk in any way. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1136 (10th Cir. 2004) (explaining that no constructive discharge occurred where the plaintiff had options to stay at the company instead of resigning). And while Montoya faced discipline in the form of two coaching sessions, the parties agree that those sessions were designed "so that the associate can understand what they are doing wrong and what they can do to fix it so they can perform their job efficiently." Doc. 103 at 24, ¶ 99; *Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 566 (10th Cir. 2010) (finding that merely being subject to discipline pursuant to a company's policy is not sufficient to show an involuntary or coerced resignation). As a result, there is nothing to suggest either faced a choice between resigning and losing their jobs, *see Tran v. Trustees of State Colleges in Colo.*, 355 F.3d 1263, 1271 (10th Cir. 2004), or that either of them resigned in light of an impending penalty, *see E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 806 (10th Cir. 2007). Moore and Montoya's dissatisfaction with their employment may have led them to resign, but they were not forced to do so—nor have they shown why a reasonable employee would feel that way. *Exum*, 389 F.3d at 1135 (explaining that a plaintiff who voluntarily resigns when there were other options was not constructively discharged).

The EEOC's contrary arguments do not change this result. It asserts that Montoya and Moore resigned because they faced discrimination and because Walmart failed to provide them with reasonable accommodations as previously discussed. Doc. 103 at 36–37. The EEOC also argues that Walmart created an intolerable working environment for Montoya and Moore when it denied them the opportunity to receive the training necessary to operate powerlifting equipment. *Id.* at 38. This work environment made Montoya feel picked on and

discriminated against, and it made Moore feel offended, angry, and emotional. Doc. 103 at 24–27, ¶¶ 95, 116, 119, 120.

While it is unsurprising that Montoya and Moore felt the way they did, those concerns are, as a matter of law, insufficient to sustain a constructive discharge claim. As the Tenth Circuit recently observed, an employee's subjective concerns about how the work environment made him or her feel are insufficient to show the level of intolerable conditions that the constructive discharge theory contemplates. *See Brown v. Austin*, 13 F.4th 1079, 1093 (10th Cir. 2021) (concluding that a plaintiff's "subjective view [was] not sufficient; he must show that conditions were objectively unbearable"). And pointing to the lack of training on how to utilize the powerlifting equipment is immaterial because the evidence suggests neither this training nor the equipment was available to any overnight stocker in Montoya and Moore's position. *Rivero*, 950 F.3d at 761 (finding no constructive discharge where the employer's actions did not impact the employee's "work routine or work environment in any respect other than his displeasure"). Put simply, the conditions Montoya and Moore describe are far from ideal, but they are not sufficient to show that they had no reasonable choice but to resign in light of Walmart's actions. *See Potts v. Davis Cnty.*, 551 F.3d 1188, 1194 (10th Cir. 2009) (finding that an employee with adverse and unpleasant experiences with his supervisors could not show that his only choice was to resign).

Nor do the cases that the EEOC relies on support its position. Those cases stand for the notion that a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge. *See, e.g., Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 303 (6th Cir. 2019). But that situation is not present here because there is no evidence that Walmart completely failed to accommodate Montoya and Moore's repeated requests such that they had no other option but to resign or labor with intolerable working conditions. *See* Doc. 103 at 3, ¶¶ 7–9. True enough, the evidence, in the light most favorable to Montoya and Moore, establishes that Walmart failed to accommodate Montoya and Moore's needs. But that, standing alone, is insufficient to establish constructive discharge. *Ford*, 45 F.4th at 1235; *Boyer v. Cordant Tech., Inc.*, 316 F.3d 1137, 1140 (10th Cir. 2003) ("[A] finding of constructive discharge may not be based solely on a discriminatory act; there must also be aggravating factors that make staying on the job intolerable.").

### D

Finally, Walmart seeks summary judgment on the EEOC's punitive damages request. Doc. 95-1 at 26. The EEOC has produced sufficient evidence, if believed, for a reasonable jury to award punitive damages. As a result, Walmart's motion is denied.

An ADAAA plaintiff may seek punitive damages as a remedy in a discrimination suit. *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 913–14 (10th Cir. 2004). Such an award is only available "if the employer acted with 'malice or with reckless indifference to the plaintiff's federally protected rights.'" *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1254 (10th Cir. 2005) (quoting *Bartee*, 374 F.3d at 913–14). To survive summary judgment on a punitive damages claim, there must be sufficient evidence for a jury to conclude that his or her employer "intentionally and illegally discriminated on the basis of a disability" and that "the employer knew the requirements of the ADA." *Heartway Corp.*, 466 F.3d at 1169.

The EEOC satisfies this standard. First, there is evidence that, if believed, suggests that Walmart intentionally discriminated against Montoya and Moore based on Walmart's denial of Montoya and Moore's accommodation requests without engaging in the familiar interactive process. *Picture People, Inc.*, 684 F.3d at 987 (citing *EEOC v. Federal Express Corp.*, 513 F.3d 360, 365, 373–74 (4th Cir. 2008)) (distinguishing facts from a case upholding a punitive damages award where the employer repeatedly failed to provide sign language interpreters at mandatory meetings and trainings). And Walmart knew from the time it hired Montoya and Moore that they were deaf and needed accommodations to effectively communicate with their supervisors. *See E.E.O.C. v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1246 (10th Cir. 1999) (allowing a jury to decide punitive damages claim where the evidence showed that the employer hired the employee "with the knowledge that in certain circumstances, including meetings and training sessions, he would need an interpreter"). Further, Montoya and Moore complained to members of management about the alleged discrimination, but there is evidence that those complaints were not investigated or were ignored. For example, Montoya and Moore told at least one of their supervisors, Walter-Gates, that they felt discriminated against because they were deaf. Doc. 103 at 22, ¶ 77. Another supervisor told Moore there was nothing he could do when Moore complained about feeling oppressed at Walmart. *Id.* at 22, ¶ 81. *Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1777, 1186 (10th Cir. 1999) (finding

punitive damages were appropriate where the employer knew about but did not respond to the plaintiff's complaints).

Second, there is evidence that the supervisors who denied Moore and Montoya accommodations knew what the ADAAA and Walmart's policies required. Doc. 103 at 15, ¶ 15; *Heartway Corp.*, 466 F.3d at 1170 (finding that a jury could reasonably conclude that punitive damages were warranted where there was evidence that the employer knew the requirements of the ADAAA but violated them). That includes the requirement that managers must initiate a process to identify an employee's limitations and discover what reasonable accommodations may exist for the employee if the manager notices or learns that the employee needs assistance to do his or her job. Doc. 95-3 at 6. *Wilkerson*, 606 F.3d at 1266 (explaining the interactive process in the context of a similar statute); *cf. LeVelle v. Penske Logistics*, 197 F. App'x 729, 737 (10th Cir. 2006) (finding there was insufficient evidence to support a punitive damages award where the employer was unfamiliar with the requirements of the ADAAA and had never received training in ADAAA compliance). Walmart may be able to persuade a jury that its managers were "unaware of the relevant federal prohibition" or that they believed their actions addressing these known concerns were lawful. *Wal-Mart Stores, Inc.*, 187 F.3d at 1246 n.3 (quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 527 (19990)). But at this stage, the EEOC has presented enough evidence for a jury to conclude that Walmart discriminated against Montoya and Moore "in the face of a perceived risk that its action would violate federal law." *Heartway Corp.*, 466 F.3d at 1169–70 (reversing judgment as a matter of law on a punitive damages claim where there was sufficient evidence for a jury to determine whether such a remedy was warranted).

## III

For the foregoing reasons, Walmart's Motion for Summary Judgment, Doc. 95, is GRANTED in part and DENIED in part, and the EEOC's Motion for Partial Summary Judgment, Doc. 92, and Walmart's Motion to Preclude Expert Testimony, Doc. 93, are DENIED.

It is so ordered.

Date: August 8, 2025                     _s/ Toby Crouse_____

Toby Crouse
United States District Judge